The first case on our agenda this morning is number 8, number 128508, Robert Miller v. The Department of Agriculture. Counsel, for the pond, are you prepared to proceed? Good morning. May it please the Court. I am Assistant Attorney General Anna Gottlieb, and I represent the appellant, the Illinois Department of Agriculture. The Illinois Grain Code promotes economic stability in the farming sector by creating a system of rules that players in the industry must follow, and it protects the farmers by maintaining the grain insurance fund. That fund provides compensation in the event of a grain elevator failure. If a farmer has a claim that has not yet been paid by a grain dealer and that grain dealer is no longer operating, the farmer may seek recovery from this limited fund, and he will recover if he can meet the requirements under the Grain Code. Here, Mr. Miller cannot show that he has met those requirements because the grain at issue was priced under Section 1015E outside the recovery window. The appellate court erred when it interpreted Section 1015E as a provision that affirmatively requires the grain dealer to set the price of the grain because the General Assembly did not state that the grain dealer is to do so. Instead, the only reasonable interpretation of this provision is that if no price later contract is signed within 30 days of delivery, as was the case here, that grain is priced as a matter of law at the market price. What do you mean by market price? So the market price is maintained by the grain dealer. It almost works like a stop ticker, and my understanding is that it's tethered to the Chicago Board of Trade price with some changes for locality and supply and demand on a given day. But at the end of each day, the grain dealer has a closing market price. So that is what the closing market price in the statute refers to. Is that defined in the statute? It is not defined there. So to the extent there is a question about that, that could be a question for a different case. But my understanding of the way the industry works is that the grain dealer has a set market price at the close of each business day. Counsel, are we required to give any deference to the Department's interpretation of the statute? So, Your Honor, to the extent there is an ambiguity in this text, meaning that it's open to more than one reasonable interpretation, then the Department's, the Director's interpretation is entitled to deference. Our primary argument here is that the language is unambiguous and that the plain language here comports with the Director's interpretation. But, yes, to the extent there is an ambiguity and the court believes that our interpretation and the appellate court's interpretation are both reasonable, then the court should defer to the Director because the Director is tasked with administering the statute and the Director has experience and expertise in this area, which this court has told us is a source of determining legislative intent. Now, the administrative law judge was involved in this matter and made a different decision.  So, Your Honor, the administrative law judge, yes, he came up, he had a different decision. Then the Department filed a petition for re-hearing and then the Director determined the statute should be interpreted as operating automatically as a matter of law. The ALJ's decision is not the final decision in this case because we do have the Director's decision and the rules of the Department tell us that that is the final decision. So, when we're talking about, for the purposes of deference, what we're supposed to be deferring to, we are speaking just about the Director's final administrative decision. And on the point of the ALJ, another reason the appellate court erred here is because it affirmed the ALJ's decision and that, after the petition for re-hearing was filed, that was no longer the final administrative decision. So, for that reason, to the extent there is, the court does not agree with the Director's final interpretation, we ask that this court remand this matter to the Department to have a final administrative decision on the date of pricing. So, Counsel, 1015E requires that, where there's a price later contract, it has to be signed within 30 days of the last delivery, correct? That's correct. Okay. Or the price is set on that 30th day after the delivery and that starts the 160-day clock running for the Grain Insurance Fund protection. Is that right? So, just one small clarification there. The 160-day clock actually works retroactively. The 160-day clock begins if there is a grain failure. So, here, the grain failure, I believe, occurred on November 1st. So, it's 160 days prior to that is the window within which the pricing must have occurred. Okay. And this failure was November 1st. First. Okay. So, then it's 160 days prior. Yes. Right? Okay. And, in this case, the contract was not signed within the 30 days. Right. And so, it's your position that the claim fails because the 160 days prior to November 1st is outside the scope of this, right? Yes. Okay. But what about the provision in 1015E that says that when pricing is established by this method, the grain dealer must send notice to the grain seller within 10 days with the terms of the agreement and that also that the fund protection is for the 160 days prior to the failure. Did that notice take place in this case? So, the notice did not take place in this case. So, what effect does that have? So, it does not change the fact that the grain did price automatically as a matter of law. The way 1015E is structured is that these are two separate events. So, the pricing is one sentence and that talks about how within 30 days of the last delivery, the grain shall be priced. And then the next sentence talks about when pricing under the subsection occurs, the grain dealer is to send notice. So, they're not contingent on one another. And so, textually, these are two separate events. So, while the notice did not take place, it doesn't change the fact that the pricing as a matter of law, that the market price applies. And so, the fact that in this particular case, there may have been no notice, that has no impact? It does not have impact because the grain code does not make the pricing contingent on the notice. And just to address any fairness concerns here, Mr. Miller was a repeat, you know, he delivered grain many times to SGI. And even on this record alone, we know that he entered into earlier price later contracts. So, each of those price later contracts under the department's rules requires certain disclosures. And it tells, you know, the farmer that they must price within 160, I'm sorry, within 30 days. I'm sorry, they must enter into contract within 30 days in order to get protections of the grain fund. So, there isn't a fairness concern as though he wasn't on notice that this is the law, that the law requires a contract to be signed within 30 days. Is there any consideration given to the course of dealing in the industry between parties like this? You know, someone delivers grain, they get a ticket for the grain. They, you know, are, and it's not always the actual producer. It could be somebody working for them, you know, it could be multiple people and then collect it. But they've had a dealing and traditionally, they usually use one elevator that they go to or one dealer that they go to. And is there any consideration given to, you know, the course of dealing or that, you know, these often are considered maybe amendments to contracts where, you know, we've had this deal. Now, we're going to get the paperwork together. And now we finally agreed, you know, this is the pricing structure since, you know, the contract that was entered in March actually is going to price these things in July of that year. So, is there any consideration that the department gives to that? So, with respect to the later contract signed in March, there is no consideration under the grain code. The grain code very plainly states that under either interpretation, whether we're talking about setting the price as a matter of law or the grain dealer pricing within 30 days, it does require that a contract be signed within 30 days. So, to the extent that, you know, the parties here agreed amongst themselves to enter into a belated contract, they do so at their own risk, meaning that they may forfeit protections under the grain code. They may forfeit protections of the fund. And I think on a broader scale, to answer your question about the course of dealing, we do think it matters here for certain things, such as that, you know, Mr. Miller was a repeat businessman in this field. So, he was aware of what the grain code requires. This is not the first time he delivered grain. So, he was aware of the loss. So, for that reason, the course of dealings does matter. But in terms of whether parties can agree to go outside the grain code, that is at their own risk. And we are here to determine whether this claim is entitled to protections of the fund. And the department's position is that you must follow the rules in order to obtain resources from this limited fund in the event of a grain elevator failure like this. Counsel, can we go back to Justice Rochford's question? What is the effect of the notice that wasn't given? It doesn't matter, or the provisions just in the statute? For what reason? So, I think the best way is to perhaps analogize to something else that we said in our brief, which is, for instance, under the Illinois Vehicle Code, when a person is given a ticket that amounts to an automatic license suspension, they are given a ticket at the time of their arrest or being pulled over, and they know that within 45 days their license will automatically expire. But then the Department of Motor Vehicles is still expected to send a notice commemorating the automatic event. So, that's similar to what happens here. So, the farmer delivers grain. He receives a receiving ticket that tells him, my 30-day clock is running now. The grain dealer and I must enter into a contract within this window. And if that doesn't happen, I'm sorry. And if that, the grain dealer under the statute should provide notice. Now, SGI, the grain dealer here, eventually failed, so it does seem as though they were perhaps not abiding by the requirements. But it doesn't change the fact that that automatic event happened. So, to your question, Your Honor, it's not superfluous or it's not kind of an added provision. It does commemorate the pricing, and it does allow the farmer to know that the pricing did occur, but the farmer has other ways of knowing that that pricing occurred, namely by delivering the grain and receiving the receiving ticket at that time. They know that that's what triggers the 30-day clock. So, counsel, to secure protection pursuant to the Grain Insurance Fund, if the contract is not signed within 30 days, there are no exceptions. The price is set at that 30th day. Yes, that is correct. And that reading actually does protect farmers on the whole for two reasons. First, if a farmer delivers grain, no contract is entered, you know, the title transfers upon the delivery of the grain. So, the grain dealer is now free to sell the grain elsewhere. They can do with the grain what they please. But the farmer is still out of money at that point. So, with this 30-day automatic provision, the farmer can go in after 30 days and demand payment. So, that's important. And second, in the event of a failure, like here, if there is no signed price later contract, the parties here entered into a late contract. So, that's what Mr. Miller relies on as the date of pricing. But other parties might not enter into a late contract, in which case that farmer wouldn't have a date of pricing to enter with his claim, and then they would not get protection from the Grain Insurance Fund, even though they might have done everything else timely. So, for those reasons, those are additional protections that the director's interpretation gives the farmers. And if I may just return to the plain language of this statute briefly. Talking about the plain language. The appellate court's opinion was very interesting, very grammar heavy. Passive voice. I think they said the American Psychological Association. What do we mean by passive voice? That seems to be really what turned the case. So, how do you – there's no doubt the language about pricing is passive. The grain is priced. If we went back to fourth grade, that's what I'm making an issue on. That's it. Passive voice. So, what do we take from that? What does that mean, the plain language and the way it's written? So, that's a great question, Your Honor. And I think there's – first, we need to look at the definition of what the verb to price means. And the verb to price means to set or to fix the price of something. So, just because of the way this provision is constructed, I think the General Assembly had to use the passive voice. And, you know, to kind of maybe provide an analogy to something more layman's terms, we're talking about gas prices. And if we say – so, the appellate court gave us alternate constructions. They said that the General Assembly could say grain prices on the 30th day or grain shell price on the 30th day. But that actually doesn't make sense with the definition of price because if we were to say the gas of price is to be $3, you wouldn't say gas prices at $3 because price means to set the price. So, the gas wouldn't be setting the price. And same thing here. The grain is – it's an object. It wouldn't be pricing the grain. So, for that reason, I do think the General Assembly had to use this passive voice construction. And I think what we need to look at here rather than just the passive voice is to look at the fact that they didn't say that the grain shall be priced by a grain dealer. That's a construction that they use elsewhere in the statute. For instance, in Section 1015H, the grain code states that price later contracts shall be issued by a grain dealer. So, the General Assembly could have very easily added by a grain dealer at the end of that sentence if that's what they meant. But they did not do that. They chose to omit that. There's no actor in this provision, which leaves us with the conclusion that this is a provision that operates automatically as a matter of law. And there are other parts of the grain code where an actor is omitted. And we cite those in our brief. And those are essentially self-executing. For instance, they say title shall transfer. Or in Section 1015C, they say the value of the grain shall be figured at the current market price. We would read that as a value that's assigned if certain conditions are met. And that's the case here. The condition is that if there is no contract signed after 30 days, the market price is assigned to that grain. So, that is the only way to read the plain language. But again, if this court believes that there is an ambiguity, precedent tells us that we should defer to the director's reasonable interpretation. And the appellate court here, again, added language that's not present on the face of the statute. And if this provision operates as the appellate court held, it will essentially have no force. What's implicit in the court's finding, I'm sorry, in the court's holding, is that if the grain dealer is to price the grain on the 30th day and that does not occur, then the farmer and the grain dealer can enter into contract at any time. And that significantly extends the amount of claims that could be covered by the grain fund. And it also... But this isn't specifically written for the event of failure. I mean, it covers the course of dealing between a producer and a dealer when there is no failure as well, correct? So, you know, for the vast majority of situations, it is a, you know, sort of a catch-all provision in the event this doesn't happen and there's no meeting of the minds afterwards, then that's the default. But that, you know, certainly isn't going to be the situation in every circumstance where there's a failure, is it? That's correct. The grain code gives us specific requirements that parties must comply with, you know, before a failure occurs. But they are aimed to curb the number of failures. You know, the grain code was passed initially and amended in various situations after many grain failures occurred, and that's because risk kept being introduced into the system. And one of the ways risk is introduced into the system is if these price leader contracts are either not signed or grain just remains unpriced for long periods of time because there is a variability from the price that a grain dealer might sell the grain from and then what the farmer demands at a later time. So it is one of the ways to promote the goals of the grain code, which is stability in the sector, is to curb the length of that time between the transfer of the grain, the delivery, and actual payment. So in that way, reading the 30-day provision as operating as a matter of law and kind of being a full backstop is important because it will significantly limit the time. Counsel, if a contract had been entered within that 30-day period and later modified by agreement between the parties, what effect would that have? So I think we would need to know more about what kind of modification it would be because the grain code actually prohibits signing a second contract to extend the protections under the grain fund. So there are only certain, I'm not actually sure any modifications will be permitted given that provision of the grain code. So it would probably refer back to the contract that was signed during that 30-day period, regardless of later modifications. That's correct. That's correct. Thank you. I see that I'm out of time. I may conclude briefly. For these reasons, we ask this court to reverse the appellate court, affirm the director's decision, and hold that Section 1015E operates as a matter of law. We also argue that none of Mr. Miller's procedural arguments here have any merit in reversing the director's decision. And if there are no further questions, we rest in our griefs. Thank you. Thank you very much. Counsel for that plea. May it please the court, my name is Timothy Cantlin, and I represent the plaintiff, Robert Miller, in this matter. This matter is before the court on a determination as to whether or not Mr. Miller is entitled to compensation under the Illinois grain code. Plaintiff asserts that we have a valid claim under the grain code because we meet the two main requirements under the grain code. Requirement number one is that the grain was priced within 160 days. Pursuant to the purchase contract that was entered into in June of 2016, he meets the 160-day requirement. He also meets the second requirement that grain was delivered within 365 days of the date of failure because this grain was delivered in January of 2016. There's no dispute about the 365 days, is that correct? No, Your Honor. It's just the 160, that's it? It's the 160 days. And our standard of review here is de novo, correct? Correct, Your Honor. But the court shall defer to the department's interpretation unless it's erroneous, unreasonable, or conflicts with the statute, is that correct? As long as there's an ambiguity in the statute, which I don't believe there is an ambiguity, but the department does get deference when they're it. But the lens that this court should be looking at this is through what the legislature talked about in the grain code. And the primary purpose of the grain code is to protect producers in the event that there's a failure. And to that end, this code shall be liberally construed and liberally administered in favor of the claimants. So while they get deference, that underlying purpose of the grain code should not be lost or not be forgotten. So clearly noting that this is the goal is to protect these farmers who have produced this grain and set it out for sale. But the language in 1015E, I mean, it couldn't be more straightforward in terms of price setting. If the contract is not signed within 30 days of the last delivery, then the price is set on that 30th day. How would we interpret it differently? Well, Your Honor, first let me start. The price later contracts aren't controlled by the farmer. Bob Miller has no opportunity to create or generate a price later contract to be signed by the grain dealer. The grain dealer, through the Eleanor Department of Ag, has exclusive control of it. And in this particular case, the price later contract is not even generated or created by the department until after the 30 days. There was no recourse for Miller to even sign a price later contract within 30 days because it was never created or generated. It's on the 45th day, I think, after delivery that SGI does do it. And I believe the evidence is that Mr. Miller signs or executes that price later contract in either three or five days after it was generated in return. In this case, that didn't happen though, right? No, it did. Well, it was generated on May 18th. Correct. And then was it signed on June 6th? No, no. There's kind of two main contracts here. One contract is the price later contract, which gets entered into on that date that you talked about. The June 6th is the purchase confirmation. So price later contract is when you deliver grain, you enter into a price later contract with the dealer that you're going to price it later at a later date and time. And so that's what Bob did. In June is when Bob and SGI agree on the actual price for those bushels. And that's set forth in the purchase confirmation, which is... So just thank you for your patience with me because this is new territory for me. Sure. So on May 18th, when the SGI sent the plaintiff that document that was titled purchase confirmation, and then it was indicated that it should be signed and returned immediately, I believe. Yeah. So let me just back up just a second to answer your question. There's two contracts that are involved in this case. There's the price later contract, 0215, which is kind of referred to as 215 in the brief. That was signed by SGI on March 9th of 2016. So the department is arguing that this should have been priced on the 31st day, which would have been February 26th. So on March 9th, SGI finally creates and generates the price later contract and sends it to Mr. Miller. Mr. Miller on March 15th, so that would be six days after he received it, signed the price later contract and sent it back to SGI. SGI and Mr. Miller then continue on as if this grain is subject to this price later contract. And there's evidence and the record is clear and undisputable. That's how they do it. Because when you then in – it's May 18th that SGI sends the purchase contract to him. This is the actual where they're setting the price of the grain that was placed on price later contract back in March. And that is sent to Mr. Miller. Mr. Miller signs the agreement as to the price on June 6th. And June 6th is when the grain is actually priced. And June 6th is within 160 days of the date of failure. And that's why Mr. Miller is entitled to compensation. Could you go back to E, to Section E, the statute? I understand that you've laid out very well and clearly the chronology of the parties here. But we were looking at the statutory interpretation. If a price later contract is not signed by all the parties within 30 days of the last delivery of grain and it wasn't, then the grain intended to be sold by the price later contract shall be priced on the next business day after 30 days from the last delivery of grain intended to be sold at the market price of the grain at the close of the next business day after the 29th day. I mean, that sounds really clear. If both parties do not sign, then the market price is the value of the grain. Isn't that what it's saying? Your Honor, what I believe the statute is saying is it's giving a directive in an order to the licensed grain dealer. And if we back up and look at this. This is the plain language. Parties didn't sign within 30 days. Right. And the statute says that if that happens, then the price is set at the market price of the grain at the close of the next business day after the 29th day. Why doesn't that just answer the question? What the statute does is it establishes how the grain is to be priced. Right. It doesn't establish the pricing of the grain. That's when they say shall be priced. But by the market price on the 29th day. Right. But it's directing SGI, who's the grain dealer in this situation, to perform a task. No, it doesn't. That sentence doesn't. That sentence doesn't. I mean, what is your understanding of market price? Well, market price is the Board of Trade trades grain. Okay. And there's different commodity months depending on which price later contract you enter into. Okay. And this particular one, I don't recall what month this is, if it's off the Dece, the March, the June contract price. Okay. And it doesn't define market price. And so market price. Is this a CBOT market price? Is that what you understand? No. I don't understand that to be market price. So what does the words in the statute mean? Well, what I believe. The idea, of course, is now they didn't enter into a contract. Okay. Within this period of time, the statute sets out. So how is anyone going to understand the value? Because they didn't enter into a contract, and this says they have to within 30 days. And it seems to me what the statute is saying is if they don't enter into agreement, automatically the statute is going to kick in and say the value of the grain is the market price of the grain at the close of the next business day after the 29th day. And, therefore, everyone understands what the value is. So they have not entered into a contract. Isn't that what it means? But the value of grain is more than the Chicago Board of Trade. There's multiple things that develop. So what's ambiguous? Is the term market price ambiguous? No, the market price is more of a generic term, in my opinion, because if they want to refer to the Chicago Board of Trade, then they would talk to the Chicago Board of Trade. Market price for Bob may be different than for another person depending on the basis, costs, and everything. And that's why it's important to read in connection with this. And when we talk about interpretation of the statute, as you know, we don't look at one little thing in isolation. We've got to continue to read the rest of the statute. And that's what they talk about. Shall send notice to the seller of the grain within 10 days. The notice shall contain the number of bushels sold, the price per bushel, and all seller of the grain applicable dispounts and net proceeds. And that's what gets him to his market price. Market price is the Chicago Board of Trade minus basis or added basis, whatever the basis is, gets you to your market value. Now, that's not what the appellate court did, right? No. This idea about what do we mean by market price, that's not how the appellate court looked at the case. They wanted to talk about this is priced idea, that it's passive voice. You can read this to say the is priced, the passive voice, is the determination of the value of the grain based on the statute, which it defines as the market price of the grain at the close of the next business day after the 29th day. Right. So I'm not sure. What is your question? Are you adopting the appellate court's analysis that the statute is ambiguous because it does not indicate how the price is priced? I don't believe the appellate court addresses the market price. What the appellate court addresses is they talk about the passive voice, as you had raised earlier. And when we talk about the passive voice, it emphasizes the action to be done, which the action to be done in this case is the pricing of the grain. Okay? And the statute says the pricing of the grain is determined by the market price. Right, but the establishment of a price is different than actually pricing it. Counsel, just for clarification, when you see the price of the Chicago Board of Trade that closes at, you know, 2 o'clock at $4.50 a bushel in Chicago, and let's say we're talking corn, does that mean that across the state and anywhere that you're going to get $4.50 a bushel for that corn? No, it doesn't. That doesn't mean you're going to get that Bob Miller is going to get $4.50 because basis factors into price. And basis is regional. And so somebody selling grain at SGI may be different than somebody selling to Cargill on the river. So there's no objective market price, even though the statute uses it. I'm not a farmer, but the language says market price, and you're saying right now that's not an objective knowable number. No, but it's an objectable process to get to the value of the grain for a particular farmer. Because you have the Chicago Board of Trade establishes what, say $4.50, as Justice O'Brien mentioned. Okay, that doesn't mean Bob Miller gets $4.50. That's not the market price to Bob Miller. The market price to Bob Miller is the Chicago Board of Trade minus the basis that he might have in that grain. Okay? And I don't have the contract. So what it says is one component of the ultimate price setting? Yes. Yes, Your Honor. Okay. And is that why when we read subsection E of the statute that we have to go beyond the sentence that ends at the 29th day and look at the notice provision? That's why the notice provision is so important. And a question was asked to the other counsel regarding, well, is the notice provision important? It absolutely is important. How can we look at just one particular line in the section and ignore the rest of section E? So the next section, the very next, and truly I'm asking questions. I'm confused and I need your help. But what I write, after 30 days the contract has been signed, the price of the grain is priced at the close of the next business day after the 29th day. When the grain is priced under the subsection. So this next sentence seems to say that the market price on the next day after the 29th day, that's when the price, it's been priced. Would you agree with that? No, I wouldn't agree with that. I would agree that it's establishing how it's supposed to be priced. But it's requiring action by the grain dealer because there's so many different components in the final pricing to Mr. Miller. That's why it's a directive. And when we look, this is Article 10. What does Article 10 say? Duties and requirements of the licensee. So the notice is supposed to say the number of bushels sold. Correct. That's knowable. The price per bushel. Correct. That's set by the market price. Correct. All ethical discounts. Right. The net proceeds and a notice that states that the grain insurance shall provide protection for a period of only 160 days. Right. And see, the price per bushel isn't the Chicago Board of Trade price. The price per bushel entails different things. There's really three. In order to get to a cash price for a farmer, you have the Chicago Board of Trade and then you have basis. And then you take those two numbers and that gives you the cash price to the farmer. And then you take ethical discounts. Like if you enter into a price later contract, they often charge you for that, two cents a bushel or something. So that's a discount that's going to come out. That's why this is requiring action by SGI. So, counsel, SGI's failure to give the notice, it's your position, it negates everything prior in terms of establishing that price? Certainly. How is Mr. Miller able to protect himself on the grain count? If he isn't given notice that this was sold, if the grain dealer continues to go on acting like it's sold under price later contract, he then sells it down the road. How is Mr. Miller ever able to protect himself if he isn't given no prior notice? He could sign a contract within 30 days pursuant to the statute. Isn't that how this is set up? But, Your Honor, other than him scouring through the grain code, which I would suggest that the department themselves didn't even realize this at first, the attorney representing the department didn't even know this. This contract never got tendered to him. And that's where it mentions this 30 days is in the contract. The only way he would know this is he scours through the grain code and he covers it. So the plain language of the statute shouldn't be applied because of the inequities that flow from it. Is that what you're arguing, really? The plain language says after 30 days, if it's not been signed, the price is set by the Board of Trade on that date. And then a notice has to be sent out. And you're saying that's not fair. Is that what you're saying? No, my first argument is that the shall be priced is a directive to the grain dealer to actually price the grain consistent with what the appellate court said. And here that never happened. The statute sets forth how it should be established, but it requires action. And that action never happened. And because that action never happened, the grain is never priced. And so the parties go on. And I want you to draw your attention to Section E because this is where it's relevant. Section E states in the event of a failure, the price later contract is not signed by all the parties to the transaction. The department may consider the grain be sold by price later contract. The preponderance of the evidence indicates the grain was to be sold by price later contract. Here we have a failure, no question. So we get through that part. The price later contract is not signed. The department's argument is a price later contract was not signed. All right? So we've met that requirement. It's not signed. But the department may consider it to be sold by price later contract, the preponderance of the evidence. What is the evidence that we have that the parties wanted this to be? So this is a trial issue? No, I don't think it's a trial issue. An evidence issue? No. The preponderance of the evidence is not? Okay. There is no evidence to the contrary. Both parties enter and execute a price later contract. Both parties continue on as if it's subject to a price later contract. And they then go ahead and sell it pursuant to a purchase confirmation. There's no question. There's no evidence to the contrary. It's not a trial issue. These are undisputed facts. Can I just ask a question about typical procedure? Again, very unfamiliar territory to me. But this is a preprinted form contract that is exchanged between the parties. Is that right? That's correct. But the department has exclusive control over it. The only way the farmer gets it is if the department sends it to him. And in this case, SGI never sent it to him. And Mr. Miller is being punished for the sins of SGI. Does it normally initiate with one party or the other? You're saying it initiates with the? It can initiate only by the licensed grain dealer. The farmer cannot generate and create this. It's only generated and created by the SGI, the licensed grain dealer. Okay. So SGI has to prepare it, tender it, and then it gets signed. And then if it doesn't get signed, you don't reach an agreement, then these provisions would take effect. But, see, the thing is Mr. Miller and SGI had agreed that this was going to be on a price-later contract. SGI just didn't get it to him timely. And it's evidence that he wanted to enter into it because he signed it. And Justice O'Brien made a comment earlier, a question, regarding consideration of the course of dealing. And the answer really was, no, there shouldn't be any consideration of the course of dealing. I think that's in direct conflict with the last paragraph of Section E. Could you wind up and bring your? Oh, I'm sorry. I did not see it. Go ahead and answer the question. Madam Chief, may I ask one question, please? Counsel, back to what Justice Tice asked you. Are your arguments based in equity? It sounds to me like you're making an equitable argument. Is this yes or no? Is your argument based in equity? The first part of the argument is not based in equity. The first part of the argument is the statute is a directive to the grain dealer. And the grain was never priced automatically. It requires action by the grain dealer. The second part of the argument is we can't apply part of the statute and fail to apply the rest of it. Two-thirds of this statute is being ignored by the Department when we talk about automatically pricing. Thank you. Thank you, Your Honor. Thank you very much. Counselor O'Connell. I'd like to just address a few clarifying points to begin. First, on the issue of market price. The market price is maintained by each grain dealer. My understanding is that in today's modern world, a lot of the grain dealers maintain websites. And at the close of the day, there is one market price for that grain dealer. What Mr. Cantlin described in terms of the basis, changing with the Chicago Board of Trade, that's something you can negotiate into a price later contract, which happened here in the belated contract. But as the statute, as the language of the statute tells us, the market price of the grain at the close of the next business day after the 29th day, that is a set number maintained by the grain dealer. What about the discounts? The discounts are, again, moisture, those types of things that are, you know, they say we're going to discount you 3%, 5%, up to 12% for the content of moisture in the grain, things like that. How would there be any way to know what would happen without this notice? Because those are sometimes disputed. So sure, Your Honor. And again, I understand that there was no notice here. But as I mentioned earlier, the notice provision does not negate the pricing provision in the prior. So there may be an opportunity for the farmer, you know, if there is no notice sent, they can call the grain dealer and ask about the closing market price and ask about the discounts. But that doesn't change the fact that the plain language here tells us that the closing price applies. When the fund pays out, let's say everything is, you know, we all agree that all the statutes have been complied with. When the fund pays out, do they pay the market price per bushel? Or do they pay the market price, the number of grains and what is the rest of the language, discounts and net proceeds? How is that figured into the amount that the fund pays out? My understanding is that it is the market price, but I would have to go back and consult. That is found in Section 2510, which speaks to how the claim is determined. So I'm actually not sure about that answer. But the fund then pays 85% of whatever the price of the grain was. And to address Mr. Cantlin's point about how well, in this case, the grain dealer just didn't tender the contract timely. So while it is true that under the grain code, the grain dealer, they hold the pre-printed contracts and they are the ones that maintain them. This is an argument that's been raised for the first time in this case that it wasn't tendered timely. There is ample opportunity in the 30 days for the farmer to say, I would like to sign this contract now. If the grain dealer is playing games or not doing so, they can certainly call the department. But this actually emphasizes just why it is so important that this provision operate as a matter of law. In the event a grain dealer doesn't send a contract timely, as Mr. Cantlin now claims, there is protection to the farmers under this provision if it operates as a matter of law. The grain is just priced at that 30-day mark. So that's just another reason why it's important to read it as the director has. What does the last sentence of E mean? About the department may consider the grain to be sold by a price later contract if a preponderance of evidence indicates the grain was to be sold by a price later contract. What does that mean? So this paragraph, I think, only applies within 30 days of delivery if a failure occurs in that 30-day window. So say I delivered grain and then on day 20 the grain dealer had failed. But we didn't have an opportunity to enter into a contract. And then the department can consider whether the farmer and the grain dealer intended to enter into contract. And then they can consider a preponderance of the evidence to see if that farmer can recover. It does not protect farmers in a case like this where the 30 days have lapsed, no contract has been entered, and now they're saying, oh, we meant to enter into one. Because this paragraph has to be read in conjunction with the preceding paragraph, and that paragraph tells us, again, regardless of interpretation, whether you believe that the event occurs as a matter of law or whether it's a directive to the grain dealer, the pricing is to take place within 30 days. So there is no opportunity to contract beyond the 30 days, and that's why the second paragraph only applies within that first 30-day window. And I'd also like to just clarify the timeline here. So there was a price leader contract entered in March 2016. Mr. Cantlin refers to the purchase confirmation contract in May 18, 2016. That is not a contract. That is just a piece of paper that was sent from SGI to Mr. Miller that said what the price was on May 18. So for this reason, the ALJ's conclusion that the June 6 date, which was the date that Mr. Miller signed this purchase confirmation, is the one that governs, that's another reason why if this court does not find that the director's interpretation controls, there are factual disputes here about what the force of that purchase confirmation is, which is why it would need to be remanded to the department. But again, this is all obsolete if this court finds that this provision should be read by its plain language, that the grain shall be priced 30 days after delivery. Counsel, in listening to all of this today, I don't understand what Mr. Miller did wrong and what he could have done differently given the fact that SGI controlled if and when the contract went out. So I wouldn't say that SGI controlled if and when the contract went out. But they do hold the pieces of paper. So does Mr. Miller, did he have the ability to generate and tender a contract? He does not have the ability to generate a contract, but he can certainly press the grain dealer to say, I'm ready to sign this contract, these are my terms, let's sign this contract. And if the grain dealer does not do that, he can certainly always call the department and let them know, because the department does have disciplinary provisions under Section 1015, in which case that they can investigate and punish grain dealers who do not comply with these provisions. So there are protections in that sense. And again, it is just another reason why it's – So is there the ability for Mr. Miller to file a complaint, a claim, saying this grain dealer is not generating this contract and I'm ready to sign? How does that work? Certainly, there is that ability. And actually, it's important for farmers to do that, because the department really does – they do inspections annually of grain dealers. So where is that in the statutory language, by which a farmer can file a complaint to complain and ensure that a contract is generated? I would have to consult. And I'm actually – I'm not sure whether it's specifically in the grain code, but in terms of – the grain code provides that the department is able to, you know, investigate and do inspections of grain dealers. So the more information that they have, the better. My understanding is that the department takes – relies on issues raised by farmers seriously. And there is a provision in the grain code, and it is cited in our brief, that in Section 2510, which discusses claimant compensation, individuals who have actually called the department and said, I haven't received payment for my grain, they actually get priority in the event of a failure. So there is an incentive. But that's different than a contract, generating a contract. That's correct, yes. So this isn't exactly on point, but Section J speaks to failure to comply with the requirements of this section may result in the suspension of privileges to purchase by price of their contract. So I think the implication is that the department must learn of a grain dealer's failure to comply. And I think it relies on farmers to notify the department to let them know. Well, counsel, let me ask you the same question I asked your opponent. Is there any equity at play here if, say, SGI or some other grain dealer, for whatever reason, never sent the contract and kept telling the farmer, oh, you're going to get it next week, so the farmer doesn't make a complaint to the department because he's expecting it to come, and then the time runs out? Is there what do we do with that? Or is it just a, well, the statute is strictly construed, and if you for some reason didn't meet the time requirements because of the grain dealer, you're just out of luck. Is that your position? I see I'm out of time to answer. So our position actually is that this interpretation actually protects farmers in that instance because on the whole, if no contract is entered, no contract is tendered within 30 days, there is a price, and that price, the farmer may demand payment upon that price. And once, unfortunately for Mr. Miller, in this circumstance, that date just happens to fall outside the 160-day recovery window. My understanding is the department, Mr. Miller never notified the department of any irregularities here. He just didn't get paid for over 160 days. But if you are to notify the department and things do, the department knows, then the date of failure would be moved up in a way where he would be able to recover. So I think it is important that this is interpreted as a way that operates as a matter of law because generally farmers will be protected. They will be able to demand payment, and they can notify the department of any irregularities in that process. I have one more question. So in this instance, with respect to this specific case, was Mr. Miller able to recover any amount of money for his grain? No, he did not recover anything. And we are here still litigating whether what he had filed with the department was valid. And again, we asked this court to affirm based on the director's statutory interpretation of the plain language. But to the extent the court disagrees, it should be sent for a remand to determine that claim. Chief, may I ask one last question? I have a question regarding the ability of the farmer to have some control. So he doesn't get this price leader contract. Maybe he's called and the dealer says, you know what, we screwed up. We weren't able to get it out. But the implication can be tremendous in terms of fluctuation in price. So what you're saying is in that circumstance, they are locked in to that 30 days. They can't renegotiate what ultimately could be a better deal by saying, you know what, we're going to send this out. And it's going to be, you know, we're going to send it out in March. We're going to put these provisions in it. You know, we'll do the pricing later on. So under your interpretation, there is no way to remediate a situation that occurs like this where the dealer did not provide the contract timely. And yet the farmer said, you know what, I don't, if it's priced here, I'm going to lose 30 cents a bushel. If I can get this benefit of the bargain as we agreed to price after, you know, from March 15th to the end of June, you know, the prices are much better. If I can negotiate that, I'm going to do much better. So under your interpretation, that can't happen. So our interpretation of the Green Code and in terms of what will allow the farmer to recover from the fund in the event of a failure is that, Your Honor. It is that at 30 days, the grain is priced. Now, the department does not really get involved in the dealings of farmers kind of on a day-to-day basis. So, I mean, in theory, two parties can do that. The department doesn't take a position on whether such an agreement would be enforceable among them. Our position is for in terms of when we're here litigating whether something is recoverable from the fund, it must comply with these requirements, even if it's a worse price than they could have negotiated. To the extent there isn't a failure, in theory, I think a farmer could take a risk and enter into a later agreement. And if there is a failure, they'll just be out of luck because they may not get the protections of the Green Code. So our position is that it must be complied in order for a farmer to recover in the event of a failure from the fund at a later time. Are the fact issues about who generates the contract and all of that kind of thing that we've been discussing, is that in the record? No. So under the Green Code, yes. The Green Code tells us that the green dealer is the one that maintains the contract. In terms of what happened in this case, that SGI didn't tender it until later, but Mr. Miller wanted it earlier, that is absolutely not in the record. Again, this is the first time it has been raised in this case. Thank you very much. Thank you, Your Honor. Both, thank you for answering all of our questions. This case, number eight, agenda number eight, number 128508, Robert Miller v. Department of Agriculture, will be taken under advisement.